## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ARKANSAS DEPARTMENT OF HUMAN
SERVICES,

      Plaintiff,

      v.                                    Civil Action No.  10-1251 (JEB)

KATHLEEN SEBELIUS,
Secretary of the United States Department
of Health and Human Services,

      and

DONALD BERWICK,
Administrator of the Centers for Medicare
& Medicaid Services,

      Defendants.

### MEMORANDUM OPINION

In April 2006, the Centers for Medicare & Medicaid Services (CMS) issued a notice of

disallowance for $4,449,682 in federal matching funds it had paid to Plaintiff Arkansas

Department of Human Services for outpatient hospital services.  The Department Appeals Board

(DAB) of the United States Department of Health and Human Services largely upheld the

disallowance, finding that it was consistent with CMS's reasonable interpretation of the

regulation governing Medicaid payment limits for those services.  In bringing this case, Arkansas

seeks to overturn the DAB's decision on the grounds that it was arbitrary and capricious and not

in accordance with law, in violation of the Administrative Procedure Act.  Arkansas first argues

that CMS's interpretation of the regulation is inconsistent with the Medicare, Medicaid and

SCHIP Benefits Improvement and Protection Act of 2000 (BIPA).  Second, it maintains that

even if CMS's interpretation is permissible, CMS was precluded from applying it to Arkansas's detriment because Arkansas lacked fair notice of this interpretation. Both parties have now moved for summary judgment. Because CMS's interpretation of the regulation is consistent with its reasonable construction of BIPA and because the disallowance does not rise to the level of the sanctions contemplated by the "fair notice" doctrine, the Court will grant Defendants' motion.

## I.      Background

### A.      The Medicaid Statutory and Regulatory Framework

The Medicaid program was established in 1965 by Title XIX of the Social Security Act as a cooperative federal-state initiative intended to assist states in providing medical assistance to low-income individuals and families. See 42 U.S.C. § 1396 *et seq.*; Harris v. McRae, 448 U.S. 297, 301 (1980). Each state administers its own Medicaid program in accordance with federal statutory and regulatory requirements and pursuant to the terms of its state Medicaid plan. See 42 U.S.C. § 1396, 1396a. Once a state's Medicaid plan is approved by the Secretary of the U.S. Department of Health and Human Services, the state becomes eligible to receive federal matching funds, or "federal financial participation" (FFP), for a percentage of the amounts "expended . . . as medical assistance under the State plan." §§ 1396b(a)(1), 1396d(b). Federal funding levels are set by a statutory formula that calculates reimbursement rates for each state based on that state's Medicaid plan. See § 1396b.

The Social Security Act requires state Medicaid plans to ensure that payments to service providers are "consistent with efficiency, economy, and quality of care." § 1396a(a)(30)(A). Pursuant to this statutory authority, CMS has established regulations imposing limits on state Medicaid payments to providers of certain medical services, including outpatient hospital and clinic services. See, e.g., 42 C.F.R. § 447.321. As of October 2000, the outpatient hospital and

clinic services regulation, 42 C.F.R. § 447.321, provided that "FFP [would] not [be] available for any payment that exceed[ed] the amount that would be payable to providers under comparable circumstances under Medicare." Id. (2000). This amount, which functions as a ceiling for FFP, is referred to as the "upper payment limit" (UPL).

In October 2000, HHS proposed a new regulation intended to close a loophole that allowed states "to reduce their share of Medicaid costs and cause[d] the Federal government to pay significantly more than it should for the same volume and level of Medicaid services." Medicaid Program; Revision to Medicaid Upper Payment Limit Requirements for Hospital Services, Nursing Facility Services, Intermediate Care Facility Services for the Mentally Retarded, and Clinic Services, 65 Fed. Reg. 60151, 60152 (proposed Oct. 10, 2000) ("Proposed Rule"). In the Proposed Rule, HHS proposed, *inter alia*, to alter the regulation concerning outpatient hospital and clinic services, 42 C.F.R. § 447.321, in the following manner: instead of a single aggregate UPL for outpatient hospital and clinic services provided by all facilities in a state, the Proposed Rule set distinct UPLs for different kinds of facilities. See Proposed Rule, 65 Fed. Reg. at 60151. "[T]o ensure continued access to care and the ability to adjust to proposed changes," the Proposed Rule also provided for two transition periods to allow certain states to come into compliance with the new UPLs. Id. A state would qualify for a transition period if it had in place an approved State Plan Amendment (SPA) that would result in payments in excess of one or more of the new UPLs. See id. at 60154. Such an SPA is referred to as "noncompliant" because its payments exceeded the new UPLs.

Shortly thereafter, in December 2000, Congress passed BIPA. Pub. L. No. 106-554, 114 Stat. 2763. BIPA required HHS to issue a final rule about Medicaid UPLs based on the October 2000 Proposed Rule. See id., 114 Stat. 2763, 2763A-575 to -577. It exempted HHS from

complying with "any requirement of the Administrative Procedure Act" with regard to the promulgation of the final rule, and it mandated that HHS provide for a longer transition period for implementing the UPL changes for certain states. See id.

CMS then promulgated its Final Rule on January 12, 2001. See Medicaid Program; Revision to Medicaid Upper Payment Limit Requirements for Hospital Services, Nursing Facility Services, Intermediate Care Facility Services for the Mentally Retarded, and Clinic Services, 66 Fed. Reg. 3148, 3148 (Jan. 12, 2001) ("Final Rule"). The Final Rule amended 42 C.F.R. § 447.321, which had previously provided for a single aggregate UPL for all outpatient service providers, so that separate UPLs applied to 1) state government-owned or -operated facilities, 2) other government facilities, and 3) privately owned and operated facilities. See 66 Fed. Reg. at 3148; 42 C.F.R. § 447.321 (2001). The Final Rule took effect on March 13, 2001, and, consistent with BIPA's requirement that a longer transition period be added to the two mentioned in the Proposed Rule, provided for three transition periods of varying length for states with noncompliant SPAs. See 66 Fed. Reg. at 3148-50, 3171; Administrative Record (A.R.) at 4.

The governing provision for the short-transition-period states, of which Arkansas was one, stated that "payments may exceed [the newly established UPLs] until September 30, 2002." See 42 C.F.R. § 447.321(e)(2)(ii)(A). The provisions governing the two longer transition periods were more nuanced, requiring states to phase down the amount by which their payments exceeded the new UPLs based on specified formulae. See id. §§ 447.321(e)(2)(ii)(B), 447.321(e)(2)(ii)(C). In addition to laying out these three transition periods, the Final Rule also established a "general rule," applicable to states subject to all three transition periods: "The

amount that a state's payment exceeded [the newly established UPLs] must not increase."  Id. §

447.321(e)(2)(i).  As set forth below, this provision is at the heart of the dispute here.

      B.  <u>Arkansas's Noncompliant SPA and the Disallowance</u>

      Arkansas's noncompliant SPA, SPA 00-10, was approved by CMS on November 29,

2000, and was made retroactively effective to May 18, 2000.  <u>See</u> A.R. at 5.  SPA 00-10 allowed

Plaintiff to make enhanced Medicaid payments to the University of Arkansas for Medical

Sciences (UAMS), the state's sole state-operated teaching hospital, for outpatient services.  <u>Id.</u> at

5-6, 50-52.  Pursuant to this SPA, Plaintiff paid providers of outpatient services statewide at a

rate of 80% of the UPL, and then paid the difference between this amount and the UPL to

UAMS.  <u>See id.</u> at 6; Pl.'s Mot. at 4.  This resulted in UAMS receiving a supplemental payment

beyond the costs of the outpatient services it provided.  <u>See</u> A.R. at 6; Pl.'s Mot. at 4; Def.'s Mot.

and Opp. at 9.

      This payment methodology was consistent with UPL regulations prior to 2001 — the

UPL applied to outpatient services in the aggregate, so Arkansas could receive FFP for enhanced

payments to UAMS so long as it remained below the UPL with respect to outpatient services as a

whole.  Because the Final Rule established a distinct UPL for state-owned or -operated facilities,

however, these supplemental payments were disallowed once the Final Rule became effective.

<u>See</u> Pl.'s Mot. at 4.  SPA 00-10, accordingly, was a noncompliant amendment.  In addition,

because it became effective on or after October 1, 1999, it was subject to the shortest of the three

transition periods established by the Final Rule.  <u>See</u> 42 C.F.R. § 447.321(e)(2)(ii)(A).

      At issue in this case are the supplemental payments made to UAMS pursuant to SPA 00-

10 during the transition period.  Plaintiff made these payments consistent with the methodology

established in SPA 00-10 through September 30, 2002, the end of the applicable transition period

5

and the day the new UPLs promulgated in the Final Rule became effective for Arkansas.  See A.R. at 6; Pl.'s Mot. at 4.  Since the amount of the supplemental payments was calculated pursuant to a percentage-based formula, the absolute amount of the payments fluctuated over time.  See A.R. at 6 n.7.  More important, the supplemental payment amount increased — both in absolute terms and, relevantly, in terms of the amount by which the payments to UAMS exceeded the amount to which UAMS would have been entitled under the new UPLs — during the transition period.  See id.

On April 7, 2006, CMS issued a notice of disallowance for $4,449,682 in FFP it had paid to Arkansas during the five quarters between July 1, 2001 and September 30, 2002.  A.R. at 6. "According to the notice of disallowance, the amount disallowed was the federal government's share of supplemental payments to UAMS that exceeded the limit established by 42 C.F.R. § 447.321(e)(2)(i)," id. at 6-7, since the "general rule" provided that "[t]he amount that a state's payment exceeded [the newly established UPLs] must not increase."  42 C.F.R. § 447.321(e)(2)(i).

C.  Procedural History

Arkansas appealed the disallowance to the DAB in May 2006.  See A.R. at 7.  The DAB, however, stayed its consideration of the case pending its resolution of Missouri Dept. of Social Services, DAB No. 2184 (2008), available at http://www.hhs.gov/dab/decisions/dab2184.pdf, which concerned an identical "must not increase" provision in a parallel portion of the Final Rule.  See A.R. at 7.  On July 11, 2008, the DAB issued its decision in Missouri, finding that the "must not increase" provision was ambiguous, but that CMS had reasonably interpreted it to require that "the amount by which a state's transition-period payments to a group of facilities (e.g., non-State government owned or operated facilities) exceed the UPL for that group could be

no greater than the amount by which Medicaid payments to that group exceeded that group's UPL in some comparable period prior to March 13, 2001, had that UPL been applicable to those payments prior to March 13, 2001." A.R. at 7 (interpreting <u>Missouri</u>, DAB No. 2184, at 2, 19-20). Despite finding that Missouri did not have actual notice of CMS's interpretation of the "must not increase" provision, the DAB upheld CMS's disallowance "because Missouri failed to show that it relied to its detriment on a reasonable alternative interpretation." <u>Id.</u> (interpreting <u>Missouri</u>, DAB No. 2184, at 27-35, 37).

After issuing its decision in <u>Missouri</u>, the DAB invited Arkansas and CMS to submit supplemental briefing on the application of that decision to this case and to specifically address whether Arkansas relied to its detriment on a reasonable alternative interpretation of the "must not increase" provision. <u>See id.</u> at 7-8. After considering the parties' additional arguments, the DAB largely upheld the disallowance. <u>See id.</u> at 8. First, it reaffirmed its finding in <u>Missouri</u> that CMS's interpretation of the "must not increase" provision was reasonable. <u>Id.</u> at 8-12. Second, it found that Arkansas did not have "timely and adequate notice" of that interpretation, but that Arkansas "failed to prove that it relied to its detriment on a reasonable alternative interpretation." <u>Id.</u> at 8, 12-16. CMS, therefore, was entitled to enforce its interpretation of the provision against Arkansas. <u>See id.</u> Third, however, the DAB found that CMS's application of the provision to Arkansas was inconsistent with its interpretation. <u>Id.</u> at 17-19. In other words, the DAB could not conclude that "CMS actually applied its interpretation in calculating the disallowance amount." <u>Id.</u> at 20. It accordingly remanded the case to CMS to permit the issuance of a revised disallowance consistent with CMS's interpretation of the "must not increase" provision. <u>Id.</u> The DAB provided that Arkansas could return within 30 days of receiving the revised disallowance if it disagreed with CMS's calculations. <u>Id.</u>

After recalculating, CMS sought a revised disallowance amount of $4,038,093 plus $391,608 in interest. Compl., ¶ 57; Def.'s Mot. and Opp. at 9. Arkansas does not contest that this amount is consistent with the DAB's decision. See Compl., ¶ 57; Pl.'s Mot. at 11. Arkansas then filed its Complaint initiating the instant suit on July 23, 2010. The Complaint sought reversal of CMS's disallowance and the DAB decision upholding it on two grounds. First, Arkansas argues that the DAB's decision and CMS's disallowance were unlawful "arbitrary and capricious" actions under the Administrative Procedure Act. See Compl., ¶¶ 63-69 (citing 5 U.S.C. § 706(2)(A)). Second, it contends that CMS's interpretation of the "must not increase" provision constituted "new, substantive rulemaking" that failed to comply with the APA's rulemaking requirements. See id., ¶¶ 70-72 (citing 5 U.S.C. § 553). Both parties now seek summary judgment.[1]

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895.

Although styled Motions for Summary Judgment, the pleadings in this case more accurately seek the Court's review of an administrative decision. The standard set forth in Rule

---

[1] In considering both parties' summary judgment Motions, the Court has reviewed Plaintiff's Motion, Defendants' Cross-Motion and Opposition, Plaintiff's Opposition and Reply, and Defendants' Reply.

56(c), therefore, does not apply because of the limited role of a court in reviewing the administrative record. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006) (citing National Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, at *7 (D.D.C. 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on other grounds, 967 F. Supp. 6 (D.D.C. 1997)). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Id. (internal citations omitted). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Richards v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." FCC v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1810 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This is a "narrow" standard of review as courts defer to the agency's expertise. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. (internal quotation omitted). The reviewing court "is not to substitute its judgment for that of the agency," id., and thus "may not supply a reasoned basis for the agency's action that the agency itself has not given." Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974) (internal

quotation omitted). Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned." <u>Id.</u> at 286.

**III.   Analysis**

Arkansas challenges CMS's disallowance and the DAB decision upholding it under § 706 of the APA, which provides that a court may "hold unlawful and set aside" agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). First, Arkansas contends that CMS's interpretation of 42 C.F.R. § 447.321 (the "must not increase" provision) is not in accordance with law and arbitrary and capricious because it is inconsistent with the governing statutory authority in BIPA. Second, even if CMS's interpretation could stand, Arkansas argues that its application of that interpretation to Plaintiff was arbitrary and capricious because Arkansas lacked notice of it. The court will address each argument in turn.

Arkansas's Complaint also included a second count, which contended that CMS violated the APA by engaging in "new, substantive rulemaking . . . without satisfying the notice and comment requirements of 5 U.S.C. § 553" when it interpreted the "must not increase" provision. Compl., ¶ 72. As Defendants' point out, however, Arkansas made no arguments concerning § 553 of the APA in its Motion for Summary Judgment. <u>See</u> Def.'s Mot. and Opp. at 12, 28 n.13. They argue, accordingly, that Arkansas has "abandoned" this claim. <u>Id.</u> at 28 n.13. Arkansas responds that it "has not abandoned Count II," explaining that "the APA notice and comment rulemaking requirements provide an additional wellspring of the fair notice obligation that CMS failed to discharge." Pl.'s Opp. and Reply at 26 n.24. Plaintiff, however, does not adhere to the contention it proffered in its Complaint — that CMS was required to announce its

interpretation of the "must not increase" provision in a notice-and-comment rulemaking.  As

explained in Section III.B, *infra*, the Court ultimately need not address § 553.

    A.  <u>CMS's Interpretation of the "Must not Increase" Provision</u>

Arkansas first argues that CMS's interpretation of the "must not increase" provision

conflicts with BIPA and, as such, is not lawful.  Both the regulatory scheme at issue in this case

and Arkansas's argument concerning CMS's interpretation are complex.  This controversy will,

fortunately, not arise again inasmuch as it relates to the transition period before the Final Rule

took effect.  In any event, it makes sense to first outline the conflicting interpretations of the

regulation and then turn to the statute.  Ultimately, CMS's interpretation of the regulation is

consistent with a reasonable interpretation of BIPA.

    1.  *The Parties' Interpretations of the Regulation*

The relevant section of the Final Rule provides:

> (e) *Transition periods*—(1) *Definitions*.  For purposes of
> this paragraph, the following definitions apply:
> (i) *Transition period* refers to the period of time beginning
> March 13, 2001 through the end of one of the schedules permitted
> under paragraph (e)(2)(ii) of this section.
> (ii) *UPL* stands for the maximum payment level under the
> upper payment limit described in paragraph (b) of this section if
> that limit had been applied to that year.
> (iii) *X* stands for the payments to a specific group of
> providers described in paragraph (a) of this section in State FY
> 2000 that exceeded the amount that would have been under the
> upper payment limit described in paragraph (b) of this section if
> that limit had been applied to that year.
> **(2) *General rules*. (i) The amount that a State's payment
> exceeded the upper payment limit described in paragraph (b)
> of this section must not increase.**
> (ii) A State with an approved State plan amendment
> payment provision effective on one of the following dates and that
> makes payments that exceed the upper payment limit described in
> paragraph (b) of this section to providers described in paragraph
> (a) of this section may follow the respective transition schedule:

> (A) For approved plan provisions that are effective on or
>     after October 1, 1999, payments may exceed the limit
>     in paragraph (b) of this section until September 30,
>     2002.
> (B) For approved plan provisions that are effective after
>     October 1, 1992 and before October 1, 1999, payments
>     during the transition period may not exceed the
>     following—
>> (1) For State FY 2003: State FY 2003 UPL + .75X.
>> (2) For State FY 2004: State FY 2004 UPL + .50X.
>> (3) For State FY 2005: State FY 2005 UPL + .25X.
>> (4) For State FY 2006: State FY 2006 UPL.
> (C) For approved plan provisions that are effective on or
>     before October 1, 1992, payments during the transition
>     period may not exceed the following:
>> (1) For State FY 2004: State FY 2004 UPL + .85X.
>> (2) For State FY 2005: State FY 2005 UPL + .70X.
>> (3) For State FY 2006: State FY 2006 UPL + .55X.
>> (4) For State FY 2007: State FY 2007 UPL + .40X.
>> (5) For State FY 2008: State FY 2008 UPL + .25X.
>> (6) For the portion of State FY 2009 before October
>>     1, 2008: State FY 2009 UPL + .10X.
>> (7) Beginning October 1, 2008: UPL described in
>>     paragraph (b) of this section.

42 C.F.R. 447.321(e) (2001) (emphasis added).  CMS cited the bolded "must not increase"

provision, 42 C.F.R. 447.321(e)(2)(i), as the legal basis for the disallowance, see A.R. at 1, and it

is the meaning of that provision upon which this case turns.

CMS interpreted the "must not increase" provision as imposing the following limitation:

> [T]he amount by which a state's transition-period payments to a
> group of facilities (*e.g.*, non-State government owned or operated
> facilities) exceeded the UPL for that group could be no greater
> than the amount by which Medicaid payments to that group
> exceeded that group's UPL in some comparable period prior to
> March 13, 2001, had that UPL been applicable to those payments
> prior to March 13, 2001.

A.R. at 7.  In other words, "the amount of excess UPL payments for all transition periods was

capped at the amount of the state's excess UPL payment in a prior comparable period."  Def.'s

Mot. and Opp. at 8. CMS maintains that this provision, which is set off as a "general rule," applies to states in all three of the enumerated transition periods. Id.

Arkansas interprets the "must not increase" provision differently. It contends that the regulation:

> (i) prohibited it from retroactively increasing its fiscal year 2000 excess UPL payments (which, if done, for some states would have the effect of inflating the excess payments permitted during the transition period) and (ii) prohibited it from changing its CMS-approved UPL methodology to increase payments during the transition period . . . .

Pl.'s Mot. at 6. In other words, Arkansas understood the provision as prohibiting changes to its payment methodology — retroactive or otherwise — that would have the effect of increasing its excess UPL payments, but did not understand it to institute a "fixed-dollar baseline." See id. at 6-8. Following this interpretation, Arkansas believed that if it continued to make payments consistent with SPA 00-10 — i.e., making supplemental payments to UAMS pursuant to the percentage-based formula established therein — until the end of the transition period, it would be in compliance with the "must not increase" provision. See id. at 6-8.

Because SPA 00-10 calculated the UAMS supplemental payments in percentage terms, however, the absolute dollar amount of excess payments increased during the transition period. A.R. at 6, 16-19. Arkansas, therefore, failed to comply with CMS's interpretation of the "must not increase" provision. Arkansas would have had to make an affirmative change to its payment methodology to conform to the hard cap CMS believed to have been established by that provision. See Pl.'s Mot. at 8; Def.'s Mot. and Opp. at 14-15. As it did not do so, CMS found it in violation and claimed the disallowance.

The Court must "give substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); see Auer v.

Robbins, 519 U.S. 452, 461-63 (1997).  Unless an agency's interpretation is "plainly erroneous or inconsistent with the regulation," the Court will not intervene to overturn it.  Federal Exp. Corp. v. Holowecki, 552 U.S. 389, 397 (2008) (quoting Auer, 519 U.S. at 461) (internal quotation marks omitted).  "This broad deference is all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program.'"  Thomas Jefferson Univ., 512 U.S. at 512 (1994) (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)) (deferring to HHS's interpretation of a Medicare regulation).

Arkansas does not contend here that CMS's interpretation of the regulation is internally inconsistent; while it argues in favor of one reading, Arkansas concedes and the DAB found that the "must not increase" provision is ambiguous.  See Pl.'s Mot. at 13; A.R. at 1.  Rather, Plaintiff argues CMS's interpretation renders the regulation inconsistent with BIPA.  Pl.'s Mot. at 10-13.  The Court must reject an agency's interpretation of its own regulation if that interpretation is inconsistent with Congress's statutory directives.  See Daugherty v. Director, Office of Workers Comp. Program, 897 F.2d 740, 742 (4th Cir. 1990) (citing Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 842-44 (1984)).  The question, then, is whether BIPA forecloses CMS's interpretation of the regulation.

### 2. *The Parties' Interpretations of the Statute*

Section 705 of BIPA, which was passed shortly after HHS issued the Proposed Rule on which the Final Rule was based, provides:

> (a) IN GENERAL.—Not later than December 31, 2000, the Secretary of Health and Human Services . . . , notwithstanding any requirement of the Administrative Procedures Act . . . shall issue . . . a final regulation based on the proposed rule announced on October 5, 2000, that—
>> (1) modifies the upper payment limit test applied to State medicaid spending for inpatient hospital services, outpatient hospital services, nursing facility services,

intermediate care facility services for the mentally retarded, and clinic services by applying an aggregate upper payment limit to payments made to government facilities that are not State-owned or operated facilities; and

(2) provides for a transition period in accordance with subsection (b).

(b) TRANSITION PERIOD.—

(1) IN GENERAL.—**The final regulation . . . shall provide that, with respect to a State described in paragraph (3), the State shall be considered to be in compliance with the final regulation required under subsection (a) so long as, for each State fiscal year during the period described in paragraph (4), the State reduces payments under a State medicaid plan payment provision or methodology described in paragraph (3) . . . , or reduces the actual dollar payment levels described in paragraph (3)(B), so that the amount of the payments that would otherwise have been made under such provision, methodology, or payment levels by the State for any State fiscal year during such period is reduced by 15 percent in the first such State fiscal year, and by an additional 15 percent in each of the next 5 State fiscal years.**

(2) REQUIREMENT.—Notwithstanding paragraph (1), the final regulation required under subsection (a) shall provide that, for any period (or portion of a period) that occurs on or after October 1, 2008, Medicaid payments made by a State described in paragraph (3) shall comply with such final regulation.

(3) STATE DESCRIBED.—A State described in this paragraph is a State with a State medicaid plan payment provision or methodology . . . which—

(A) was approved, deemed to have been approved, or was in effect on or before October 1, 1992 . . . or under which claims for Federal financial participation were filed and paid on or before such date; and

(B) provides for payments that are in excess of the upper payment limit test established under the final regulation required under subsection (a) (or which would be noncompliant with such final regulation if the actual dollar payment levels made under the payment provision or methodology in the State fiscal year which begins during 1999 were continued).

(4) PERIOD DESCRIBED.—**The period described in this paragraph is the period that begins on the first State fiscal year**

15

> **that begins after September 30, 2002**, and ends on September 30,
> 2008.

Pub. L. No. 106-554, 114 Stat. 2763, 2763A-575 to -577 (emphases added).

Arkansas argues that the bolded portions of BIPA foreclose CMS's interpretation of the "must not increase" provision as prohibiting all states from increasing the amount of their excess UPL payments during the transition period. See Pl.'s Mot. at 10-13. Those sections of the statute, Arkansas contends, "unambiguously required the Final Regulation to provide that long transition states" — those described in § 705(b)(3) of BIPA and 42 C.F.R. 447.321(e)(2)(ii)(C) — "that appropriately reduced their Medicaid payments after September 30, 2002 could not be found out of compliance with the Final Regulation . . . ." Id. at 11 (emphasis added). In other words, Arkansas maintains that the statute prohibited HHS from placing any restrictions on long-transition states' excess UPL payments during the period prior to September 30, 2002. See id. As long as long-transition states appropriately reduced their excess UPL payments beginning September 30, 2002, the Final Rule was required to deem them compliant no matter what occurred prior to that date. See id. Because CMS's interpretation and the DAB's analysis upholding it rely on the premise that the "must not increase" provision applies to states in all three transition periods, see A.R. at 9, Arkansas argues that CMS's interpretation must be rejected altogether since it contradicts BIPA with respect to long-transition states. See Pl.'s Mot. at 13.

Put another way, CMS's interpretation of the "must not increase" provision allegedly runs afoul of BIPA because CMS's reading prohibits all states, including those subject to the long-transition period, from increasing their excess UPL payments from the moment the Final Rule was effective. It would, accordingly, place a limited restriction on long-transition states during the eighteen months between the effective date of the Final Rule, March 13, 2001, and the

date of the first required phase down, September 30, 2002. Specifically, a long-transition state that complied with the phase-down schedule after September 30, 2002, but increased the amount of its excess UPL payments prior to that date, would have failed to conform to the "must not increase" provision of the Final Rule, as interpreted by CMS. See id. This, Arkansas believes, cannot be correct.

CMS responds that its interpretation of the "must not increase" provision does not contradict BIPA because BIPA does not constrain HHS's ability to restrict long-transition states' pre-September 30, 2002, excess UPL payments. See Def.'s Mot. and Opp. at 19. Instead, it interprets the bolded portion of the statute as instructing HHS to add a third transition period, pursuant to which certain states were to reduce their excess UPL payments consistent with the phase-down schedule set forth in § 705(b), to the two transition periods already contained in the Proposed Rule. See Def.'s Opp. and Reply at 8. BIPA, accordingly, dictated only what a long-transition state was required to do after September 30, 2002 — the date the phase-down schedule was to begin — in order to comply with the Final Rule. See Def.'s Mot. and Opp. at 19. CMS does not interpret BIPA as having anything to say about the period before September 30, 2002. The crux of the dispute, then, is whether § 705(b) of BIPA precluded HHS from requiring that long-transition states not increase the amount of their excess UPL payments during the pre-September 30, 2002, time period.

### 3. Chevron *Analysis*

In reviewing an agency's interpretation of a statute it administers, the Court follows the two-step analytical framework established by Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc. 467 U.S. 837 (1984); see also, e.g., Shays v. Federal Election Comm'n, 414 F.3d 76, 96 (D.C. Cir. 2005), Republican Nat'l Comm. v. FEC, 76 F.3d 400, 404 (D.C. Cir. 1996). "First,

always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842-43. This inquiry is commonly referred to as "<u>Chevron</u> step one." <u>See, e.g.</u>, <u>Intermountain Ins. Serv. of Vail v. CIR</u>, 650 F.3d 691 (D.C. Cir. 2011). "'Although <u>Chevron</u> step one analysis begins with the statute's text,' the court must examine the meaning of certain words or phrases in context and also 'exhaust the traditional tools of statutory construction . . . .'" <u>Sierra Club v. EPA</u>, 551 F.3d 1019, 1027 (D.C. Cir. 2008) (quoting <u>Am. Bankers Ass'n v. Nat'l Credit Union Admin.</u>, 271 F.3d 262, 267 (D.C. Cir. 2001)).

Section 705(b)(1) of BIPA states that a long-transition state "shall be considered to be in compliance with the final regulation . . . so long as, for each State fiscal year during the period described in paragraph (4), the State reduces payments" appropriately. The "period described in paragraph (4)" "begins on the first State fiscal year that begins after September 30, 2002." <u>Id.</u> at § 705(b)(4). CMS interprets the provision to require that, <u>with regard to the period after the start of the phase-down schedule in September 2002</u>, long-transition states be considered in compliance with the Final Rule if they reduced their payments as outlined in the provision. The question for the Court at this stage is whether, as Arkansas contends, Congress precluded this interpretation and required that long-transition states be considered in compliance <u>with every provision</u> of the Final Rule if they reduced their payments appropriately post-September 30, 2002.

Arkansas emphasizes that "[t]he word 'shall' is the language of command in a statute." <u>Ass'n of Am. R.R. v. Costle</u>, 562 F.2d 1310, 1312 (D.C. Cir. 1977). While it is clear that Congress intended to "command" HHS to do <u>something</u>, it does not follow that it commanded

HHS to permit long-transition states to increase their excess UPL payments prior to September 30, 2002. Indeed, the statutory text does not clearly establish whether long-transition states that complied with the post-September 30, 2002, phase-down schedule must be considered compliant with every provision of the final regulation or merely with the phase-down schedule established therein.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989); cf. Ariz. Pub. Serv. Co. v. EPA, 211 F.3d 1280, 1287 (D.C. Cir. 2000) (court must "exhaust[ ] traditional tools of statutory construction" at Chevron step one). Context is particularly important here: BIPA was enacted immediately after and in reaction to the Proposed Rule on which the Final Rule was based. See generally BIPA, Pub. L. No. 106-554, 114 Stat. 2763, 2763A-575 to -577. Section 705(a) of BIPA, which described in general terms what Congress sought to accomplish in the subsequent portions of the statute, explicitly required HHS to issue "a final regulation based on the proposed rule . . . that . . . provide[d] for a transition period in accordance with subsection (b)." Id. (emphasis added). This section of the statute suggests that Congress intended § 705(b) to require HHS to add a third transition period with the specified phase-down schedule to the two transition periods outlined in the Proposed Rule, not to preclude HHS from requiring that long-transition states not increase their excess UPL payments prior to the start of that schedule.

Ultimately, it is not clear whether BIPA had anything at all to say about the period prior to September 30, 2002, let alone that it prohibited the Final Rule's requirement that excess UPL payments not increase. Because the statute is ambiguous, the Court must turn to Chevron step two. "At Chevron step two we ask whether the agency's interpretation of the statute is

'reasonable.'" Northeast Hospital Corp. v. Sebelius, 2011 WL 4036318, at *11 (D.C. Cir. 2011)

(citing Abington Crest Nursing & Rehab. Ctr. V. Sebelius, 575 F.3d 717, 719 (D.C. Cir. 2009));

see Chevron, 467 U.S. at 843. At this stage, the Court must uphold the agency's interpretation if

it is "based on a permissible construction of the statute." Chevron, 467 U.S. at 843. "The court

need not conclude that the agency construction was the only one it permissibly could have

adopted to uphold the construction, or even the reading the court would have reached if the

question initially had arisen in the judicial proceeding." Id. at 843 n.11.

　　The Court here finds that HHS reasonably filled the statutory gap when it instituted the

"must not increase" provision. In response to a comment on the Proposed Rule, HHS explained

the rationale behind requiring that states not increase their excess UPL payments during the

transition period: "While we have included generous transition periods, we do not think it is

appropriate to permit States to make payments that would further increase the amount of

payment that is in excess of the new UPLs." Final Rule, 66 Fed. Reg. at 3163. The purpose of

instituting transition periods was to enable states to come into compliance with the new UPLs,

see id. at 60154, not to enable them to move farther out of compliance. When Congress

mandated that the Final Rule include a third, longer transition period for certain states, HHS

reasonably interpreted BIPA not to simultaneously and implicitly require that the Final Rule

permit those states to increase their excess UPL payments prior to beginning the phase-down

schedule.

　　Seeking to demonstrate that Defendants' interpretation is unreasonable, Arkansas

suggests that "[o]n the government's view (that BIPA does not address the period prior to

September 30, 2002), CMS could have published a regulation requiring long-transition-period

states to comply with the final, new UPLS between March 13, 2001 and September 30,

2002 . . . , before these states benefitted from the phase-down schedule after September 30, 2002." Pl.'s Opp. and Reply at 4. The fact that BIPA did not require that long-transition states be able to increase their excess UPL payments prior to September 30, 2002, however, does not imply that it need permit this hypothetical regulation. Indeed, such a regulation might very well be inconsistent with both the Proposed Rule, on which Congress stated that the Final Rule should be based, and BIPA inasmuch as it would defeat the entire purpose of the transition periods. In any event, the plausibility of CMS's interpretation of BIPA with respect to the regulation at issue in this case does not turn on the plausibility of that interpretation with respect to a regulation it did not promulgate.

In addition, it is worth noting that Arkansas's own interpretation of the regulation is likely inconsistent with its interpretation of BIPA. Arkansas argues that BIPA prohibited <u>any</u> restriction on long-transition states' pre-September 30, 2002, excess UPL payments and challenges CMS's interpretation of the regulation on that ground. Arkansas's interpretation of the regulation, however, seems to suffer from the same alleged defect. Arkansas emphasizes that it "has never denied that excess UPL payments in the transition period were subject to "some limitation" and that the "point of dispute between Arkansas and CMS" is simply "the contour" of that limit. Pl.'s Opp. and Reply at 16; <u>see also id.</u> at 30. According to Arkansas, the "must not increase" provision "prohibited it from retroactively increasing its fiscal year 2000 excess UPL payments . . . and . . . from changing its CMS-approved UPL methodology to increase payments during the transition period . . . ." Pl.'s Mot. at 6. Even under Arkansas's interpretation, therefore, long-transition states could comply with the post-September 30, 2002, phase-down schedule and still run afoul of the final regulation if, for example, they increased payments during the preliminary transition period.

In the final analysis, CMS reasonably interpreted BIPA to permit some limits on long-transition states' excess UPL payments prior to September 30, 2002. Its interpretation of the "must not increase" provision of the Final Rule is consistent with this reasonable interpretation of the statute. The Court, therefore, will not overturn the DAB's decision on BIPA grounds.

   B.  <u>Fair Notice</u>

Even if CMS's interpretation of the "must not increase" provision is consistent with BIPA, Arkansas argues that CMS may nevertheless not apply that interpretation to its payments. <u>See</u> Pl.'s Mot. at 13-28. Citing a line of D.C. Circuit cases concerning the "fair notice" doctrine, Arkansas contends that an agency may not apply its interpretation of an ambiguous regulation to a party's detriment where, as here, that party lacked notice of the agency's interpretation. <u>See</u> <u>id.</u>

This Circuit's "fair notice" doctrine has its roots in the Fifth Amendment's Due Process Clause. <u>General Electric Co. v. EPA</u>, 53 F.3d 1324, 1328 (D.C. Cir. 1995); <u>see also</u> <u>United States v. Chrysler Corp.</u>, 158 F.3d 1350, 1354-55 (D.C. Cir. 1998); Albert C. Lin, *Refining Fair Notice Doctrine: What Notice is Required of Civil Regulations*, 55 BAYLOR L. REV. 991, 992-98 (2003). "Of course, it is in the context of criminal liability that this 'no punishment without notice' rule is most commonly applied." <u>General Electric</u>, 53 F.3d at 1329. In <u>General Electric</u>, however, our Circuit confirmed that the "fair notice" doctrine also applies to civil regulations:

> [A]s long ago as 1968, we recognized this "fair notice" requirement in the civil administrative context. In <u>Radio Athens, Inc. v. FCC</u>, we held that when sanctions are drastic — in that case, the FCC dismissed the petitioner's application for a radio station license — "elementary fairness compels clarity" in the statements and regulations setting forth the actions with which the agency expects the public to comply.

<u>Id.</u> at 1329 (quoting <u>Radio Athens, Inc. v. FCC</u>, 401 F.2d 398, 404 (D.C. Cir. 1968)). What began, then, as a principle of due process in the criminal context "has now been thoroughly

'incorporated into administrative law.'"  Id. at 1329 (quoting Satellite Broadcasting Co. v. FCC, 824 F.2d 1, 3 (D.C. Cir. 1987)); see also Envtl. Serv. Inc. v. EPA, 937 F.2d 649, 654 n.1, 655 (Edwards, J. concurring in part and dissenting in part) (fair notice doctrine is "basic hornbook law in the administrative context" and "simple principle of administrative law").

While it is clear that the notice requirement is not limited to the criminal realm, it also has not been applied to limit agencies' interpretations in all contexts.  Nearly all of the cases applying the "fair notice" doctrine concern an agency's imposition of a penalty against a private party and, moreover, formulate the doctrine in terms of penalties.  See, e.g., Rollins, 937 F.2d at 653 ("[A] regulation carrying penal sanctions must give fair warning of the conduct it prohibits or requires." (citation omitted)); Howmet Corp. v. EPA, 614 F.3d 544, 553 (D.C. Cir. 2010) (providing that an agency may not "penaliz[e] a private party for violating a rule without first providing adequate notice"); Trinity v. FCC, 211 F.3d 618, 238 (D.C. Cir. 2000) (invoking the doctrine because the agency "imposed a severe penalty"); General Electric, 53 F.3d 1324, 1329-30 (applying fair-notice analysis explicitly "because the agency imposed a fine").

In United States v. Chrysler Corp., 158 F.3d 1350 (D.C. Cir. 1998), however, our Circuit rejected the argument that the doctrine only applies to "cases involving explicit penalties or actions that the Court described as punitive in some manner."  Id. at 1354 (internal quotation marks and citation omitted).  The Chrysler Corp. panel instead held that "a recall, which entails the expenditure of significant amounts of money, deprives Chrysler of property no less than a fine," and, accordingly, "is a 'sufficiently grave sanction' such that the duty to provide notice is triggered."  Id. at 1354-55 (quoting Sattelite Broad. Co., Inc. v. FCC, 824 F.2d 1, 3 (D.C. Cir. 1987)).  The focus on the gravity of the sanction involved makes sense: the "fair notice" doctrine has its roots in due process, so courts have applied it when an agency "deprive[s] a party of

property by imposing civil or criminal liability," <u>Trinity</u>, 211 F.3d at 238 (quoting <u>General Electric</u>, 53 F.3d at 1328-29) (internal quotation marks omitted), "or where sanctions are drastic." <u>Darrell Andrews Trucking, Inc. v. Fed. Motor Carrier Safety Admin.</u>, 296 F.3d 1120, 1130 n.8 (D.C. Cir. 2002) (quoting <u>General Electric</u>, 53 F.3d at 1328-29) (internal quotation marks omitted); <u>see also</u> Lin, *Refining Fair Notice Doctrine*, 55 Baylor L. Rev. at 996-98 ("[C]ourts have generally found fair notice applicable to civil penalties and in some cases have extended its protection to other agency sanctions. The D.C. Circuit, for example, has held that the fair notice requirement applies in civil cases 'when sanctions are drastic.'" (citations omitted)).

A disallowance of federal matching funds that had been provided to a state is categorically different from the kinds of sanctions courts have found "sufficiently grave" to merit the application of the "fair notice" doctrine. The loss, while not insignificant, amounts to around 6% of the amount paid to UAMS <u>beyond</u> the UPL for those services, <u>see</u> A.R. at 19, 45, and to a miniscule proportion of the total Medicaid federal matching funds Arkansas received during the relevant time period. <u>See generally</u> Centers for Medicare & Medicaid Services, Medicaid Budget & Expenditure System, CMS-64 Quarterly Expense Report, "Financial Management Reports for FY 1997 through FY 2001" and "Financial Management Report FY 2002 through FY 2010," <u>available at</u> http://www.cms.gov/MedicaidBudgetExpendSystem/02_CMS64.asp. Plaintiff, moreover, is not a private party, and it is not being forced to relinquish massive amounts of its property, like Chrysler in <u>Chrysler Corp.</u>, or denied a renewal of a valuable license, like Trinity in <u>Trinity</u>. The disallowance concerned supplemental payments that were not even related to Medicaid costs actually incurred by UAMS — they were payments <u>beyond</u> the UPL for the medical services actually provided by that facility. <u>See</u> A.R. at 6, 16-18. At

bottom, the disallowance is simply not the type of sanction enforced against a private party that would warrant invocation of fair notice.

Were the "fair notice" doctrine applied, as Arkansas seems to propose, to every case in which a party disputes an agency's interpretation of a regulation, it would swallow <u>Auer</u> deference. Agencies cannot be expected to regulate with perfect clarity, <u>cf.</u> <u>United States v. Williams</u>, 553 U.S. 285, 290 (2008) ("perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity" (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 779 (1989)) (internal quotation marks omitted)); this is especially the case with regard to complex regulatory regimes like Medicaid. If an agency were prevented on notice grounds from enforcing its interpretation of a regulation against any party who proffered a reasonable alternative interpretation and suffered any monetary loss, the practice of deferring to an agency's reasonable interpretation of its regulations, <u>see</u> <u>Auer</u>, 519 U.S. at 461-62, would be rendered essentially meaningless. Courts would be flooded with challenges to administrative actions, and agencies would be unable to administer their regulations efficiently. The "fair notice" doctrine has not been — and ought not be — extended this far.

Finally, because the "fair notice" doctrine Arkansas invokes is inapplicable to the case at hand, the Court need not reach the parties' arguments concerning the adequacy of notice provided, the reasonableness of Arkansas's alternative interpretation, or whether Arkansas was required to show detrimental reliance on that interpretation.

## IV. Conclusion

The Court, therefore, will grant Defendants' Motion for Summary Judgment and deny

Plaintiff's.  A separate Order consistent with this Opinion will be issued this day.


      **SO ORDERED**.


                                 /s/ James E. Boasberg
                                 JAMES E. BOASBERG
                                 United States District Judge

Date:  October 12, 2011